## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

KIM SADDLERS,

     Plaintiff,

v.                                Case No: 8:22-cv-2127-CEH-LSG

CITY OF LAKELAND, FLORIDA,
BENJAMIN BLOMMEL and CHAD
LANDRY,

     Defendants.

_____

## **ORDER**

This civil rights action comes before the Court on Plaintiff Kim Saddlers'
Motion to Exclude the Testimony of the Proffered Defense Expert Witness under Fed.
R. Evid. 702 and *Daubert* (Doc. 19), Defendants City of Lakeland, Benjamin Blommel,
and Chad Landry's Motion for Summary Judgment (Doc. 20), and the respective
responses in opposition (Docs. 27, 29). Further, the Court ordered supplemental
briefing on the summary judgment motion (Doc. 44), which the Parties provided
(Docs. 45, 47) and the Court considered.

After careful consideration, and being fully advised in the premises, Plaintiff's
*Daubert* Motion will be denied. Defendants' Motion for Summary Judgment will be
granted as to the excessive force claim against Officer Blommel and granted-in-part as
to the excessive force claim against Officer Landry. Otherwise, the motion will be
denied, for the reasons that follow.

## I.    RELEVANT FACTS[1]

### Background Facts and Prelude to the Dog Bite

The claims in this case stem from an unfortunate chain of events, as a routine three-officer search degenerated in the blink of an eye to chaos in a cramped apartment, the arrests of four family members, and a police dog attack that caused severe injuries to Plaintiff. Several facts in this case are undisputed, some of which the Parties set out in their Stipulation of Agreed Material Facts (Doc. 30). The Court will begin there and make note of the disputed facts surrounding the incident.

In March 2019, Plaintiff Kim Saddlers and her family resided in an apartment complex in Lakeland, Florida. Doc. 20-6 at 1. Plaintiff's family members at the apartment on the night in question included her long-time significant other Lorenzo Isaac and Iquan and Kevonte Isaac, two of the couple's sons. *Id.* at 2.

Defendants Benjamin Blommel and Chad Landry were police officers employed with the City of Lakeland. *Id.* ¶¶ 1–2. Together with Landry's police dog, they responded to a third officer's call that night to pursue a criminal suspect in the

---

[1] The Court has determined the facts, which are undisputed unless otherwise noted, based on the parties' submissions, including declarations and exhibits, as well as the parties' Stipulation of Agreed Material Facts (Doc. 30). For purposes of summary judgment, the Court considers the facts in the light most favorable to the non-moving party as required by Fed. R. Civ. P. 56.

While the Court highlights discrepancies in testimony and the record here, in resolving the Motion, it must ultimately view all disputed facts and reasonable inferences therefrom in the light most favorable to Plaintiff. These facts may differ from those ultimately proven at trial. *See Lee v. Ferraro,* 284 F.3d 1188, 1190 (11th Cir. 2002). As to the qualified immunity issues in this matter, the Court considers the legal issue of whether the "plaintiff's facts," if proven, show that the defendant(s) violated clearly established law. *See Priester v. City of Riviera Beach,* 208 F.3d 919, 925 n.3 (11th Cir. 2000) (quotations omitted).

area—a suspect with no connection to Plaintiff, her apartment, or family members. *Id.* ¶ 2.

Officer Landry was accompanied by a Belgian Malinois police dog named "Nox," who will be referred to as a police dog or canine elsewhere in the Order. *Id.* ¶ 3. The initial officer on the scene stated to Officers Blommel and Landry that he last saw the fleeing suspect at the southern end of Plaintiff's apartment complex. *Id.* ¶ 4. Before the officers began their search, Officer Landry provided a general warning to those nearby, shouting: "Lakeland Police Department canine unit. If you can hear my voice, make your presence known or the canine unit will find and bite you." *Id.* ¶ 5.

There was no response to the general warning. Officer Landry commanded the dog to begin tracking on a sidewalk abutting the apartments around 12:27 a.m. *Id.* ¶ 6. As the dog tracked a scent, Landry observed Plaintiff's son Iquan and a neighbor approximately 50 feet ahead of him, standing outside of Apartment #110—Plaintiff's apartment. *Id.*

The Parties stipulate that Plaintiff's apartment was "small." Doc. 30 ¶ 7. And that it contained a living room with numerous items of furniture—and a kitchen, dining room, and bedroom. *Id.* Plaintiff and Lorenzo shared the bedroom with their grandchild, while other family members slept in the living room on couches. *Id.* Plaintiff testified that just after midnight, she was up to change her three-month-old granddaughter and prepare her for bed. Doc. 20-6 at 3. Suddenly, Iquan and a neighbor, who were chatting outside, ran into the apartment, knocking over a table

and a lamp. *Id.* at 8. Iquan told Plaintiff that officers told them to enter the apartment and unleashed the dog, forcing them to rush back in.[2] *Id.*

The noise awakened Lorenzo. He opened the apartment door and stepped outside around the time the officers resumed their track of the suspect. Doc. 30 ¶¶ 8–9. Lorenzo kept the door open to observe the officers. Doc. 20-6 at 9. He was instructed by one of the officers to "shut the door," but (he testified), Officer Blommel forced his way inside the apartment as he closed the door.[3] *Id.* Blommel, who had by then entered the apartment, began to grapple and struggle with Lorenzo as he tried to apprehend him, ultimately using a taser on him. Doc. 20-6 at 11; Doc. 30 at ¶¶ 10–11.

The Parties largely dispute what came next. During the fracas between Lorenzo and Officer Blommel, Plaintiff (grandchild in hand) moved toward the door to get out of the way and avoid a shattered picture frame, middle table, and an end table. Doc. 20-6 at 9–10. She tripped and fell over the furniture, losing hold of her grandchild. *Id.* at 10. Plaintiff stated that she "just needed to get out of there because I had the baby in my hand" and did not "know what was going on. I just needed to get out of there."

---

[2] Iquan Isaac testified as follows at his deposition (Doc. 20-7). First, he stated that the officers told him to go inside. When he asked them why, they threatened to release the dog on him and his neighbor if they did not comply. Doc. 20-7 at 3–4. Iquan testified that Lorenzo went to the door and asked the officers "What's going on?" *Id.* at 3. Mistaking Lorenzo for Iquan, an officer responded, "Didn't I just tell you to get in the house?" and said he would release the dog on Lorenzo if he did not enter the house. *Id.* at 3–4. The officer told Lorenzo that he would be arrested if he did not go inside. *Id.* at 3. He refused, which led to the subsequent altercation, dog bite, tasing, and arrests.

[3] The various witnesses and parties to the case present different recollections of what exactly was said by the officers to Lorenzo and the events leading up to Officer Blommel entering the room. *See* Docs. 20-6, 20-7, 27-1, 27-2.

*Id.* Then, after falling to the ground, and having had no other interaction with the officers, she realized the police dog was actively biting her arm. *Id.*

As the dog forcefully bit the inner side of Plaintiff's left arm, it began to pull her out of the doorway. *Id.* Plaintiff does not believe Officer Landry ever entered the apartment. *Id.* But the dog continued to bite her. Plaintiff testified that it took her son Kevonte kicking the dog to ultimately free her arm. Doc. 20-6 at 11. Although Plaintiff was "hollering" as she stuck her hand in the dog's mouth to try and free herself, she testified that Officer Landry issued no commands.[4] *Id.* at 11–12. Further, Plaintiff testified that no one but Lorenzo had their hands on Officer Blommel as the biting continued and Officer Landry held his position at the doorway. *Id.* at 12.

Plaintiff's son Iquan provided more details as to the dog bite. He testified that Plaintiff fell over the table, breaking the glass, when she attempted to "grab" Lorenzo from Officer Blommel. Doc. 20-7 at 3–5. Subsequently, Plaintiff fell to the floor and the police dog latched on to her arm. *Id.* at 3. Kevonte told Officer Landry to command the dog to release, but Landry continued "sitting there." *Id.* Kevonte states that the dog maintained its bite on Plaintiff for a "good minute." *Id.* at 6. Kevonte then kicked the dog once and it finally released its bite. *Id.*

Lorenzo, Plaintiff's significant other, testified that after being tased, he heard Plaintiff scream and saw the dog pulling her out of the door. Doc. 20-8 at 3. He

---

[4] Plaintiff also testified that at the emergency room, she asked Officer Landry what she had done to be arrested and why he had not commanded the dog to release her arm. Doc. 20-6 at 11. She states that he responded with laughter. *Id.*

remembers Kevonte trying to get the dog off her, kicking it as Plaintiff tried to pull it off herself. *Id.* He believes that Plaintiff's own actions led to the dog releasing, not the kick(s). *Id.* at 5. Lorenzo testified that Officer Landry merely stood there, "hands on his knees," "acting like he was in a daze." *Id.*

When the dog ultimately released its grip, Plaintiff wrapped her bloodied arm with an article of clothing and sat down outside her front door. Doc. 20-6 at 12. Officer Landry noticed Plaintiff and told a later-arriving officer that Plaintiff was under arrest. *Id.* Plaintiff was transported to the hospital and required stitches on her arm that ultimately had to be removed and reinserted due to an allergic reaction. Doc. 20-6 at 13, 15.

**Officer Chad Landry's Testimony and Sworn Report**

Officer Landry presented a different version of events in his sworn report and deposition. As background, he testified that he was assigned one dog, named "Nox," from some time in 2018 to November 2019, when he departed the Lakeland Police Department. Doc. 27-1 at 2–3. He stated that during this time, in addition to Plaintiff, the dog bit other persons, but he does not know and cannot recall how many. *Id.* at 3–4. He could not recall if there were ten, fifty, a hundred, or even thousands of additional bites. *Id.* at 4.

As to the night in question, Officer Landry stated that he came across Iquan and his neighbor outside the apartment and commanded them back inside. *Id.* at 7. He remembered seeing Plaintiff with a baby in her arms at some point, but does not remember whether the baby was handed over to another individual before or after the

conflict. *Id.* at 9. Asked what Plaintiff specifically did to Officer Blommel, Landry responded at his deposition: "Dude, you're asking me about four people that assaulted one person. I don't remember, man. Like they were all fucking him up." *Id.* Officer Landry further stated that he does not know if he saw Plaintiff inflict blows or strikes on Officer Blommel, stating that there were several people "hitting" and "grabbing" Blommel. *Id.* at 11. Thus, says Landry, he could not say "exactly who the hell hit him." *Id.*

Officer Landry testified that when Plaintiff approached the doorway of the apartment, his dog "immediately grabbed her by the arm and apprehended her." *Id.* at 10. Although no command was given to bite, Officer Landry stated that the dog was "there to apprehend" the suspects and certainly could have apprehended any of them. *Id.* Further, Officer Landry stated that Plaintiff was a suspect, and that the canine had full authority to apprehend all the apartment's occupants except for the female holding the baby (presumably, the neighbor). *Id.*

Separately, in his sworn report dated nine days after the incident, Landry provides a somewhat different version of the incident, as well as certain additional facts. *Id.* He wrote that he guided the police dog "*into* the apartment to utilize him to assist and protect Officer Blommel by biting one of the subjects striking him." Doc. 20-17 at 3. Then, Plaintiff fell to the ground in the doorway "while actively participating in the altercation." *Id.* Finally, he wrote that Plaintiff reached across the open doorway in an attempt to close the door to the apartment while Kevonte approached the doorway and forcefully kicked the dog in the face. *Id.*

Only then, wrote Officer Landry in his affidavit, *after* the kick, did the dog bite Plaintiff in the right forearm out of instinct and training. Plaintiff grabbed the dog by the mouth and attempted to pry his mouth open, and Landry was prevented from "directing [his] attention to the use of force" on Plaintiff by these kicks. *Id.* In his sworn report, Officer Landry stated that when he fell backward, the leash pressure coupled with the multiple kicks caused the dog to release its bite.[5] *Id.*

**Officer Blommel's Testimony and Aftermath**

Defendant Officer Blommel arrived at the scene around the same time as Officer Landry. Doc. 27-2 at 5. He corroborates seeing Iquan and Plaintiff's neighbor outside the apartment, and states that they may have run inside quickly because the police dog was barking at them. *Id.* at 7. He does not remember seeing a baby in Plaintiff's hands at any point, in contrast to several other witnesses, including Officer Landry. *Id.* at 10. However, he does recall three sets of arms wrapped around his waist and chest during the altercation with Lorenzo, which formed the basis for the arrest of Plaintiff for battery on a law enforcement officer. *Id.*

Officer Blommel saw the police dog bite Ms. Saddlers, and recalled that after the initial bite happened, it did not immediately release that arm. *Id.* at 13. Further, he

---

[5] Officer Blommel testified to a somewhat different sequence of events. He stated that after the bite, *Lorenzo* punched Officer Landry in the face and kicked the canine while it was still biting Plaintiff. Doc. 27-2 at 14. Then he and Lorenzo ended up outside, and he did not see when the bite was released. *Id.*

Officer Landry did not describe being punched by Lorenzo in his deposition or affidavit of November 2, 2023. *See* Doc. 20-16.

stated that the bite lasted at least 10-15 seconds before he lost sight of the dog and Plaintiff altogether. *Id.* at 14.

Ultimately, Plaintiff was arrested for battery on a law enforcement officer under § 784.07(2)(B), Florida Statutes. She was charged in the Circuit Court of Polk County, Florida but the case was dismissed on November 2, 2021. Doc. 30 at 3.

Based on the events described above, Plaintiff filed the instant action, alleging claims for State Law Battery, Negligence, and False Arrest against the City of Lakeland (Counts I–III). Doc. 2 at 9–11. Against Officer Benjamin Blommel, she alleges False Arrest under 42 U.S.C. § 1983 (Count IV) and Excessive Force under 42 U.S.C. § 1983 (Count V). The same two federal claims are alleged against Officer Landry in Counts VI and VII. *Id.* at 12–16.

**Defense Expert Ken Wallentine's Testimony**

Plaintiff asks that the Court exclude the testimony of defense expert Kenneth Wallentine. *See* Doc. 19. As relevant, Wallentine produced a 28-page report containing his opinions on the events of this case. *See* Doc. 19-1. His qualifications include working as a law enforcement officer in Utah, formerly serving as the Chief of Law Enforcement for the Utah Attorney General, and serving as Bureau Chief of the Utah Department of Public Safety, Peace Officer Standards and Training Division, among a number of other positions across the fields of law enforcement, police use-of-force and accountability research, teaching, legal practice, and expert legal services. *Id.* at 18–27.

The report indicates that Wallentine reviewed the Complaint, police accident and incident reports, the use of force report and photographs, deposition transcripts of Plaintiff and her sons, the Case Management and Scheduling Order, and a transcript of a witness statement. *Id.* at 1. Using his experience, education, and familiarity with law enforcement practices and techniques, Wallentine states that his report was drafted "to a reasonable degree of scientific certainty" and "professional certainty considering law enforcement guidance and accountability standards." *Id.* at 1–2.

The report starts with an abbreviated summary of the events in question, beginning with an attempted traffic stop on a stolen vehicle and leading to Plaintiff's arrest and serious injuries. *Id.* at 2–6. Then, it moves on to provide Wallentine's opinions on the case. *Id.* at 6–18.

Plaintiff asks the Court to exclude three opinions under *Daubert* and Rule 702. The first is Wallentine's statement that "Officer Landry's decision to deploy [police dog] Nox to search for and track the unidentified suspect from the stolen car and his actions in tracking with Nox were reasonable and were consistent with accepted policies, practices, and training for police service dog teams." *See* Doc. 19 at 3; Doc. 19-1 at 7. The second opinion is that "[t]he unintentional bite to Plaintiff occurred as the officers were acting consistently with the actions of reasonable and well-trained officers attempting to defend themselves and to make lawful arrests of their assailants." *See* Doc. 19-1 at 12. Finally, Plaintiff moves for exclusion of Wallentine's opinion that "[c]iting Plaintiff for the offenses for which she was arrested was consistent with the actions of a reasonable and well-trained officer." *Id.* at 16. Although these three

opinions are challenged in isolation, they do not stand alone in the report, but instead are subheadings, under which Wallentine provides further explanation and opinions. *See* Doc. 19-1.

## II.    LEGAL STANDARD

### A. Exclusion of Expert Testimony

Federal Rule of Evidence 702 governs the admissibility of expert testimony and provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Rule 702 is a codification of the United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  In *Daubert*, the Supreme Court described the gatekeeping function of the district court to "ensure that any and all scientific testimony or evidence is not only relevant, but reliable." *Id.* at 589; *see also United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (*en banc*). The Court extended its reasoning in *Daubert* to non-scientist experts in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

In performing its gatekeeping function, the Eleventh Circuit has stated that district courts should consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address, (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*, and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Frazier*, 387 F.3d at 1260 (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)). Thus, the three discrete inquiries to determine the admissibility of expert testimony are qualifications, reliability, and relevance. *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1341 (11th Cir. 2003). Although there is some overlap among these inquiries, they are distinct concepts that the Court and litigants must not conflate. *Id.*

"The admission of expert testimony is a matter within the discretion of the district court, which is afforded considerable leeway in making its determination." *Frazier*, 387 F.3d at 1258. The gatekeeper role, however, is not intended to supplant the adversary system or the role of the jury: instead, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. "The judge's role is to keep unreliable and irrelevant information from the jury because of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311–1312 (11th Cir. 1999).

### B. Summary Judgment

Summary judgment is appropriate only when the court is satisfied that "there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law" after reviewing the "pleadings, the discovery and disclosure materials on file, and any affidavits[.]" Fed. R. Civ. P. 56(c)(2). In determining whether a genuine issue of material fact exists, the Court must consider all the evidence in the light most favorable to the nonmoving party. *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1164 (11th Cir. 2003). Issues of fact are "genuine only if a reasonable jury, considering the evidence presented, could find for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it may affect the outcome of the suit under governing law. *Id.*

The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004). That burden can be discharged if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. "Only when that burden has been met does the burden shift to the non-moving party." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

"[I]n order to survive summary judgment, the nonmoving party must set forth specific facts showing there is a genuine issue for trial." *Johnson v. New Destiny Christian*

*Ctr. Church, Inc.*, 826 F. App'x 766, 770 (11th Cir. 2020) (citing *Anderson*, 477 U.S. at 249-50).  "[U]nsupported 'conclusory allegations' do not suffice." *Middlebrooks v. Sacor Fin., Inc.*, 775 F. App'x 594, 596 (11th Cir. 2019).  Likewise, "[a] 'mere existence of a scintilla of evidence' cannot suffice to create a genuine issue of material fact." *Johnson*, 826 F. App'x at 770 (quoting *Anderson*, 477 U.S. at 252).

## III.    DISCUSSION

First, Plaintiff moves to exclude the expert testimony of Ken Wallentine as unreliable, unhelpful, or otherwise impermissible because it opines on the ultimate issues in this case. Defendants respond that the authority Plaintiff cites is distinguishable, and that in fact Wallentine's testimony complies with the requirements of *Daubert* and Federal Rule of Evidence 702. Having considered the relevant standards and arguments, the Court agrees with Defendants that there is no basis to exclude any of the opinions to which Plaintiff objects.

Next, Defendants move for summary judgment on each of the remaining claims. Their motion will be denied as to all but one of the counts, however, and a portion of another count.

Beginning with Plaintiff's false arrest claims under 42 U.S.C. § 1983 (Counts IV and VI), a reasonable jury could rule for Plaintiff against either officer. Making all reasonable inferences in Plaintiff's favor that are supported by the record, as the Court must, Plaintiff never touched either officer. Instead, while her significant other was suddenly being arrested in their apartment, she merely tripped, fell, and then was subjected to a minute or more of excruciating pain as a police dog bit her arm. This

version of events does not support actual or arguable probable cause to arrest Plaintiff for battery on a law enforcement officer, so the false arrest claims will go forward as to both officers. For similar reasons, Plaintiff's state law false arrest claim against the City of Lakeland (considered under a similar standard) will go forward, as a jury could reasonably find there was no probable cause for her arrest based on the same circumstances.

Whether Plaintiff's excessive force claims under 42 U.S.C. § 1983 (Counts V and VII) survive, however, is a closer call. These claims are based on the initial dog bite, as well as Officer Landry's failure to call the dog off in a reasonable manner, and Officer Blommel's failure to intervene.

The Court will grant Defendants' motion in part as to Officer Landry. He argues that there was no Fourth Amendment seizure of Plaintiff at all, as the dog was not intentionally deployed, and that even if there was a seizure, his own testimony and that of Officer Blommel show that it was not excessive. As to the issue of seizure, the Court disagrees. Based on Plaintiff's version of events, a reasonable jury could find that when Officer Landry's dog bit Plaintiff, an active suspect according to Landry, this qualified as an intentionally applied use of force used to restrain her. However, as described below, the initial bite of Plaintiff as she fell directly in front of the dog was not excessive under *Graham* and did not violate Plaintiff's clearly established rights. On the other hand, however, the unnecessarily prolonged duration of the bite was excessive and violated Plaintiff's clearly established rights. Therefore, summary

judgment is granted in part as to the excessive force claim against Landry, but not as to the prolonged duration of the bite.

Summary judgment will be granted in full on the excessive force claim as to Officer Blommel. This is because it is undisputed that Blommel was not in control of the dog. Therefore, the claim against him would have to be premised on his failure to intervene in the dog bite. Because the record would not allow a reasonable jury to conclude that Officer Blommel was able to observe the incident and had the opportunity to intervene as he fought with Lorenzo, Blommel is entitled to qualified immunity and cannot be held liable for failure to intervene. For largely the same reasons, Plaintiff's state-law battery claim against the City of Lakeland (akin to excessive force when suing an arresting officer) will go forward.

Finally, summary judgment will not be granted to the City of Lakeland on Plaintiff's negligence claim. Many material facts surrounding the events of that night are disputed, and a reasonable jury could find that the City, through the actions of its officers, breached its duty to exercise reasonable care, leading to Plaintiff's severe injuries.

### A. Plaintiff's Motion to Exclude Expert Testimony (Doc. 19)

The *Daubert* Motion will be addressed first, and it will be denied.

Plaintiff seeks exclusion of three opinions in Ken Wallentine's expert report. Doc. 19 at 3. The first opinion is that Officer Landry's decision to deploy the police dog and his actions in tracking were "reasonable" and "consistent with accepted policies, practices, and training for police service dog teams." This opinion is

contained in a subheading of the Report. Doc. 19-1 at 7. Wallentine discusses the practical and legal factors that officers consider in deploying force, with reference to the United States Supreme Court's decision in *Graham v. Connor*, 490 U.S. 386 (1989). *Id.* He then discusses Officer Landry's consideration of the various factors present that night and his reasonable beliefs as he tracked the initial suspect. *Id.* at 8–12. The report goes on to discuss Landry's actions in comparison with what a reasonable police service dog handler would do, and ends by noting that Landry's (and the dog's) tracking was interrupted by Plaintiff's son and neighbor on the sidewalk. *Id.* at 11–12.

Plaintiff argues that her claims have nothing to do with Defendants' actions in tracking the unknown car theft suspect. Doc. 19 at 3. Instead, she contends that they are based on the officers' actions in arresting her and subjecting her to excessive force in the process of that arrest. *Id.*

Defendants respond that the opinion is relevant and gives context to the circumstances preceding Plaintiff's arrest and injuries. Doc. 29 at 6. They argue that this portion of the report provides background as to why it was that Plaintiff and Defendants crossed paths in the first place and why a police dog was used. *Id.* Overall, Defendants assert that this opinion is important to establishing the background, context, and reasonableness of Defendants' actions and should not be excluded. *Id.*

Plaintiff's motion will be denied as to the first opinion. Her arguments are non-specific as to how the opinion is "irrelevant," and—especially as to the relevance arguments—are unsupported by caselaw. Plaintiff addresses the subheading of an

opinion as a stand-alone opinion but does not analyze the bullet-points and paragraphs of Wallentine's analysis underneath that heading. *See* Doc. 19-1 at 7–9.

Moreover, the Court agrees with Defendants that the leadup to the events could not only inform the jury, generally, but also have a direct bearing on Defendants' culpability as to the claim for negligence, and specifically on whether either officer breached his duty to use reasonable care in conducting their investigation and during the subsequent altercations.

The Court declines to exclude the first opinion and its underlying analysis based on Plaintiff's general argument as to relevance. Instead, the Court agrees that vigorous cross-examination and the presentation of contrary evidence is the proper method for challenging the first Opinion. However, to the extent Plaintiff asserts further objections to this opinion based on Rules 402 and/or 403, Federal Rules of Evidence, they may be raised at trial.

Nor will the second opinion be excluded. Wallentine's subheading was that "[t]he unintentional bite to Plaintiff occurred as the officers were acting consistently with the actions of reasonable and well-trained officers attempting to defend themselves and to make lawful arrests of their assailants." Doc. 19-1 at 12. The report goes on to describe the evidence Wallentine drew upon to conclude that the canine was not employed to apprehend Plaintiff, and that its bite was an instinctive and defensive behavior to protect his handler. *Id.* at 12–16.

Plaintiff argues that this second opinion improperly purports to "divine Landry's state of mind in employing his police dog to arrest Ms. Saddlers, and thus

addresses the excessive force issue in the case." Doc. 19 at 4. However, she argues that Landry's state of mind is squarely within the province of the jury, and that allowing this opinion would "supplant the jury's ultimate fact-finding role." *Id.*

Defendants respond that the opinion does not speculate about Landry's state of mind and instead draws upon Wallentine's experience and the facts of this case to conclude that the canine was not instructed to apprehend Plaintiff and instead acted in accordance with his instinctual drive and trained behavior to protect his handler, Landry. Doc. 29 at 7. Thus, argue Defendants, the opinion should not be excluded because Plaintiff's counsel can attack the assumptions upon which his opinions are based, and his credibility, not their admissibility. *Id.*

The Court agrees with Defendants as to this second opinion and will not exclude it. As Defendants argue, an expert witness is allowed to consider his client's version of the disputed facts in a case over the other side's in formulating his opinion. *Pellegrino v. Wengert*, No. 15-CV-60535, 2016 WL 3678600, at *9 (S.D. Fla. July 12, 2016).

Plaintiff fails to cite relevant authority under *Daubert* or Rule 702 that would apply to the opinion. Because the opinion does not violate *Daubert* or Rule 702, it would be inappropriate for the Court to strike it at this point. *See Rink v. Cheminova, Inc.,* 400 F.3d 1286, 1293 n.7 (11th Cir. 2005) ("[V]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). The broad objections to the report and facts considered in drafting it go to "credibility

and weight, not admissibility," and therefore Plaintiff's Motion will be denied, without prejudice to more detailed objections being raised at trial. *See Feliciano v. City of Miami Beach*, 844 F. Supp. 2d 1258, 1262 (S.D. Fla. 2012)

Plaintiff challenges a third opinion in Wallentine's report. Again, she points to a subheading, this one stating that "[c]iting Plaintiff for the offenses for which she was arrested was consistent with the actions of a reasonable and well-trained officer." Doc. 19-1 at 16–18. Considering the facts in light of his knowledge and experience in the areas of police training and the prosecutorial process, Wallentine opined that the Lakeland Police Department followed processes consistent with common practice throughout the United States and consistent with the actions of a reasonable well-trained officer. *Id.* at 17–18.

Plaintiff later discusses *Daugherty v. Graves*, 2013 WL 501670 (E.D. Tenn., Feb. 8, 2013) and argues that its principles apply to this case. *Id.* at 7–11. However, Defendants counter that *Daugherty* is distinguishable from the expert opinions in this case for a number of reasons. Doc. 29 at 9–10.

The Court agrees with Defendants. First, the *Daugherty* Court found that an expert's opinions were "rife with legal conclusions" and improperly supplanted the role of the jury in applying the expert's version of the law to his version of the facts. 2013 WL 501670, at *3–4. Among the expert's excluded opinions in *Daugherty* were that law enforcement officers have no "legal duty to protect," that Plaintiff's Fourth Amendment rights were violated, that she was assaulted, that she was resisting an unlawful arrest, that the officers violated Plaintiff's Constitutional rights, and that the

officers used excessive force in doing so. *Id.* These and other portions of the expert's report in that case were found to be blatant legal opinions that weighed the evidence, found the facts, applied the law as the expert saw it, and resolved the case. *Id.* at 3.

Instead of explaining why Wallentine's opinions are similarly defective, Plaintiff presents the broad argument that his "proffered testimony in this case suffers from the same deficiencies identified by the court in *Daugherty*." Doc. 19 at 10. Having reviewed *Daugherty*, an out-of-circuit district court opinion which is not binding on this Court, the Court disagrees that the report here, on its face, suffers from the same deficiencies.

Wallentine does not present improper legal conclusions as the expert in *Daugherty* did, and he does not offer opinions that would supplant the role of the jury, such as that the officers did not violate Plaintiff's rights, that they did not use excessive force, or that they do not have certain legal duties. *Daugherty*, 2013 WL 501670 at *3. Therefore, Plaintiff fails to establish that any of Wallentine's opinions should be excluded based on *Daugherty*.

Plaintiff references a second case, one that involved Wallentine himself. Although certain opinions of Wallentine's were indeed disregarded by the trial court in *Charbonneau v. Demings,* Case No. 2017-CA-010862 (Fla. 9th Jud. Cir., Apr. 4, 2019), Plaintiff's argument that this undermines Wallentine's methodology in this case and justifies exclusion is unsupported by law.

In *Charbonneau*, the Court concluded that Wallentine's opinion regarding whether an individual who was shot by police could have trained his weapon in a

"fraction of a second" was not credible based on common sense, physiology, and physics. Doc. 19-3 at 7–11. The Court, based on video footage of the incident, disagreed. *Id.* at 8–9.

That case, however, did not explicitly reference the *Daubert* standard for exclusion of evidence (or any standard, for that matter). Instead, it merely found that certain expert opinions were not credible, and therefore denied qualified immunity to Defendant. *See* Doc. 19-3. Therefore, *Charbonneau* is distinguishable both on the facts and on the law from this case and does not serve as a basis for exclusion here.

In conclusion, as to each of the challenged opinions, the Court returns to the factors that the Eleventh Circuit holds are most relevant to the *Daubert* standard. These are whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *Frazier,* 387 F.3d at 1260.

Wallentine's qualifications are unchallenged, and Plaintiff provides no reason to doubt that he is qualified to testify competently regarding common police training and practices with regards to service dogs, as well as the use of police dogs in investigating crimes, and police tactics and practice more broadly.

As to reliability, Plaintiff makes no specific argument besides referencing and attaching *Charbonneau*, the aforementioned state court case in which certain opinions

Wallentine provided were "disregarded." This is not enough to establish that his opinions are unreliable here. Although Plaintiff argues that Wallentine characterizes the facts in the light more favorable to Defendants in his report, Defendants are correct that an expert is permitted to formulate his opinion considering his client's version of the disputed facts or the other side's version. *Pellegrino v. Wengert*, No. 15-CV-60535, 2016 WL 3678600, at *9 (S.D. Fla. July 12, 2016); *see also Feliciano*, 844 F. Supp. 2d at 1258.

Finally, as described above, Plaintiff fails to establish that the expert testimony would not be helpful to the trier of fact. Instead, the Court finds that Ken Wallentine's opinions would likely be helpful to the jury based on his qualifications, experience, analysis of the records, evidence, deposition testimony, and based on his expertise as a law enforcement officer, professor, police dog trainer, and investigations supervisor. Therefore, Plaintiff's motion is denied.

## B. Defendants' Motion for Summary Judgment (Doc. 20)

### 1. Federal Claims

Plaintiff brings claims for excessive force and false arrest against both officers pursuant to 42 U.S.C. § 1983. *See* Doc. 2 at 12–16. Defendants seek summary judgment. First, the Officers argue that neither officer violated Plaintiff's clearly established constitutionally protected rights. *See* Doc. 20 at 14–18. Next, they argue that the Officers are entitled to qualified immunity on the false arrest and excessive force claims. *Id*. at 20-25. Finally, Defendants argue that the City cannot be liable for

the state law claims. *Id*. at 26-29. Because the analysis of qualified immunity includes a determination regarding whether Plaintiff's clearly established rights were violated, the Court begins by addressing qualified immunity.

As to qualified immunity, Defendants contend that Plaintiff's clearly established rights were not violated as to the false arrest claim because each had probable cause to arrest Plaintiff. *Id.* at 14–18. As to the excessive force claims, Defendants argue that there was no intentional seizure, so there can be no such claim. *Id.* at 19–20. Moreover, regarding Officer Blommel, Defendants argue the record was clear he was not handling the canine, and the record also clearly could not support a failure to intervene claim against him. *Id.* at 20–21.

Next, Defendants argue (and it is not disputed by Plaintiff) that Officers Landry and Blommel were acting within the scope of their discretionary authority in tracking a suspect that night. *Id.* at 24–25. They assert that either officer had arguable probable cause to arrest Plaintiff. *Id.* at 25–26. They cite back to their earlier description of their basis for probable cause and also cite to the expert report of Ken Wallentine. *Id.*

Turning back to the excessive force claims, they argue Plaintiff's clearly established rights were not violated because there was no seizure. *Id.* at 26. Then, Defendants conclude by highlighting the fact that Plaintiff's three family members were convicted of battery on a law enforcement officer after the incident.[6] *Id.* at 26–27.

---

[6] No explanation is provided (nor is authority cited) for the proposition that the conviction of other individuals after an incident somehow weighs against a finding of excessive force. Doc. 20 at 26–27. Whether Plaintiff's three family members were subsequently convicted of battery

Plaintiff responds as to excessive force first, discussing several cases she argues that show her clearly established rights were violated during the dog bite. Doc. 27 at 20–24. She argues that based on the evidentiary record, a seizure clearly occurred when she was bitten by the dog, and clearly established law reflects that the force used was unreasonable. *Id.* at 23–24. Specifically, Plaintiff highlights that she and other eyewitnesses testified that Officer Landry allowed the dog to continue biting her and issued no commands, despite frantic efforts to persuade him to do so. *Id.* at 23–24.

As to the false arrest claims, Plaintiff argues that granting qualified immunity to the officers would also be improper. *Id.* at 24–26. She lays out the elements of battery and argues that she did not lay a hand on either officer and only touched the dog for a moment in an effort to release its bite. *Id.* at 25. On these facts, she argues, no reasonable officer would have arguable probable cause to arrest her for battery on a law enforcement officer. *Id.* at 25–26.

Qualified immunity shields federal and state officials from money damages unless the plaintiff can establish that (1) the official violated a statutory or constitutional right, and (2) the right was clearly established at the time of the challenged conduct. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). During a qualified immunity analysis at the summary judgment stage, the Court "must take the facts in the light most favorable to the party asserting the injury." *Robison v. Arugueta*, 415 F.3d 1252, 1257 (11th Cir. 2005).

---

on a law enforcement officer after the incident in question is irrelevant to the Court's analysis of this issue.

"To receive qualified immunity, the government official must first prove that he was acting within his discretionary authority." *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003) (citing *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002)). Discretionary authority includes all actions of a government official that (1) "were undertaken pursuant to the performance of his duties" and (2) were "within the scope of his authority." *Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir. 1994) (quoting *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir. 1988)). The Eleventh Circuit has held that "[a] police officer generally acts within the scope of his discretionary authority when making an arrest." *McDowell v. Gonzalez,* 820 F. App'x 989, 991 (11th Cir. 2020).

"Once the defendants have established that they were acting within their discretionary authority, the burden shifts to the plaintiffs to show that qualified immunity is not appropriate." *Gonzalez,* 325 F.3d at 1234.

**Discretionary Authority**

There is no dispute that the Officers were acting within the scope of their discretionary authority. As the Parties stipulated, Officer Landry was a Lakeland police officer who responded to another officer's call along with his canine. Doc. 30 ¶ 3. Officer Blommel, too, was an on-duty Lakeland police officer who responded to the call and pursuit of a fleeing criminal suspect. Considering the stipulated facts and arguments of the Parties, the Court agrees that the officers were acting under color of state law in responding to the call for assistance and attempting to track a fleeing

suspect. Therefore, they were acting within their discretionary authority. *See Bates v. Harvey*, 518 F.3d 1233, 1242 (11th Cir. 2008).

Next, the officers argue that they should be granted qualified immunity on both the false arrest and excessive force claims. We start with the simpler of the two: false arrest.

**False Arrest Under 42 U.S.C. § 1983 (Counts IV and VI)**

As Officers Blommel and Landry have established that they acted within their discretionary authority, the burden shifts to Plaintiff to demonstrate that qualified immunity is inappropriate. *Brooks v. Warden*, 800 F.3d 1295, 1306 (11th Cir. 2015). In that event, Plaintiff must satisfy this two-pronged inquiry: (1) whether the facts that she has shown "make out a violation of a constitutional right"; and (2) whether the right at issue was "clearly established" at the time of the alleged misconduct. *Gilmore v. Hodges*, 738 F.3d 266, 267 (11th Cir. 2013) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). The Court may address either prong first. *See Pearson*, 555 U.S. at 236.

In the qualified-immunity analysis, the Court must resolve all issues of material fact in favor of Plaintiff, and then determine the legal question of whether Defendants are entitled to qualified immunity under that version of the facts. *Stephens v. DeGiovanni*, 852 F.3d 1298, 1313 (11th Cir. 2017) (internal quotation marks omitted). With the facts construed in this manner, the Court "ha[s] [Plaintiff's] best case" and "material issues of disputed fact are not a factor in the court's analysis of qualified

immunity and cannot foreclose the grant or denial of summary judgment based on qualified immunity." *Id.* (internal quotation marks omitted).

A warrantless arrest lacking probable cause violates the Fourth Amendment and forms a basis for a section 1983 claim. *Ortega v. Christian*, 85 F.3d 1521, 1525 (11th Cir. 1996). But if probable cause supports Plaintiff's arrest, it acts as an "absolute bar" to her § 1983 claim for false arrest. *Carter v. Butts Cnty.*, 821 F.3d 1310, 1319 (11th Cir. 2016). To determine whether an officer had probable cause for an arrest, a court must "examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable officer, amount to probable cause." *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (internal quotation marks omitted). Probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Id.* (internal quotation marks omitted). "Probable cause is not a high bar." *Id.* (internal quotation marks omitted). "The totality of the circumstances requires courts to consider the whole picture," as "the whole is often greater than the sum of its parts—especially when the parts are viewed in isolation." *Id.* at 588 (internal quotation marks omitted). "[T]he relevant inquiry is not whether particular conduct is innocent or guilty, but the degree of suspicion that attaches to particular types of noncriminal acts." *Id.* (internal quotation marks omitted).

Moreover, to receive qualified immunity, Defendants need have only *arguable* probable cause, not actual probable cause. *Grider v. City of Auburn*, 618 F.3d 1240, 1257 (11th Cir. 2010). And "[a]rguable probable cause exists where reasonable officers in

the same circumstances and possessing the same knowledge as the defendant could have believed that probable cause existed to arrest." *Gates v. Khokhar*, 884 F.3d 1290, 1298 (11th Cir. 2018) (internal quotation marks and alterations omitted) (original emphasis removed).

Again, Defendants argue that neither Officer is liable for false arrest because each had probable cause to arrest Plaintiff. Doc. 20 at 15–18. Drawing from Officer Landry and Officer Blommel's recollections, testimony, and affidavits related to the incident, they argue that Officer Blommel had probable cause to arrest Plaintiff for battery because he saw her move behind him during his struggle with Lorenzo and felt "around three pairs of hands or arms grab him" as if trying to pull him away. *Id.* at 16. As to Officer Landry, they argue that he had probable cause based on his own independent observations of Plaintiff moving toward the front door to close it, at which point she tripped and was bitten. *Id.* at 16–17. Finally, they argue that based on the "fellow-officer rule," information in the possession of one police officer is imputed to the other, making an arrest legal as long as the police "as a whole" were in possession of information sufficient to constitute probable cause. *Id.* at 17 (citing *Yessin v. City of Tampa*, 613 F. App'x 906, 907 (11th Cir. 2015)).

Plaintiff responds that the officers are not entitled to qualified immunity for the false arrest counts. Citing *Edger v. McCabe*, 84 F.4th 1230, 1236 (11th Cir. 2023), she argues that the standard for determining whether an officer receives qualified immunity is whether he has arguable probable cause, which "in a false arrest case is no different from the clearly established law inquiry." Doc. 27 at 24. Further, Plaintiff

contends that arguable probable cause exists only if "a reasonable officer, looking at the entire legal landscape at the time of the arrests, could have interpreted the law as permitting the arrests." *Id.* (citing *Edger*, 84 F.4th at 1236–37).

Plaintiff next applies the elements of battery to the facts, viewed in the light most favorable to her, and argues that because she testified she never touched either officer, and only touched the dog for a moment in an effort to release its bite, no reasonable officer would have probable cause to arrest her for battery in the absence of evidence she actually and intentionally touched him. Doc. 27 at 25–26.

Likewise, the Court must consider the elements of battery on a law enforcement officer and the relevant facts, taken in the light most favorable to Plaintiff, to determine whether there was arguable probable cause for her arrest. The Parties do not dispute that the elements of the offense are: (1) the defendant actually and intentionally touched or struck the officer against his will; (2) the officer was a law enforcement officer; (3) the defendant knew the victim was a law enforcement officer; and (4) the officer was engaged in the lawful performance of his duties when the battery was committed. *See* Doc. 27 at 25; Fla Std. Jury Instr. 8.11.

Plaintiff's version of the facts, which the Court considers as the operative facts for purposes of this analysis, is: during the altercation that ensued after Officer Blommel followed Lorenzo into the apartment, Plaintiff had her granddaughter in her arms and tried to get out of the way "for the officer." Doc. 20-6 at 9. Shattered glass from a picture frame and two tables was strewn askew across the living room, and Plaintiff was forced to go to the area near the door to avoid it. *Id.* Thus, she was in

30

motion, granddaughter in hand, as Officer Blommel entered the apartment. *Id.* at 9–10. She fell over the furniture, losing her hold on the baby, which was luckily picked up by their neighbor, according to the testimony of other witnesses. *Id.* at 10. Then, suddenly, Plaintiff realized that the police canine was clamped onto her arm, although she had had no interaction with either officer. *Id.* Later, sitting outside her apartment, she was arrested without explanation for battery on a law enforcement officer.

This version of the facts, which has support in the record, is accepted by the Court to be the governing facts for the qualified immunity analysis. Consequently, as attested by Plaintiff, during the chaos of the incident, she never touched either officer and only touched the dog (which was actively biting her and causing her extensive injury) briefly to release its bite on her arm. Doc. 20-6 at 12. Plaintiff also notes that although Blommel claims he "detected" six separate and discernible arms around him, which led him to include Plaintiff in his probable cause affidavit, Landry's sworn statement corroborates Plaintiff's testimony that her granddaughter was in her arms until the point she fell in the doorway. Doc. 20-17 at 3. At this juncture, the Court resolves any disputes of material fact in favor of *Plaintiff* in denying (or granting) qualified immunity.

Instead, the Court agrees with Plaintiff that no reasonable officer would have arguable probable cause to arrest an individual for battery on a law enforcement officer where she did not touch either officer, and merely tripped and fell near her door in an attempt to make way for the police before she was bitten by a police dog. Even taking into account the ongoing altercation between Lorenzo and Officer Blommel and the

tense situation, Defendants cite no authority that would support arresting Plaintiff for having tripped, fallen, and being bitten by a dog. This is Plaintiff's version of events and based on it, the Court must deny qualified immunity to both officers.[7]

In sum, having made all reasonable inferences in favor of Plaintiff and based on her version of the facts, there was not actual probable cause to arrest Plaintiff for battery on an officer. Nor could any reasonable officer interpret the law as permitting arrest in this case. Therefore, there was no arguable probable cause either, and Plaintiff's clearly established right to not be arrested in the absence of actual or arguable probable cause was violated. *See Edger*, 84 F.4th at 1240.

### Excessive Force Under 42 U.S.C. § 1983

Next, Defendant Officers Blommel and Landry argue that they are entitled to summary judgment on Plaintiff's excessive force claims because there was no seizure for purposes of the Fourth Amendment and neither officer used excessive force. Doc. 20 at 19–21. Defendants contend that proving a Fourth Amendment violation based on excessive use of force requires Plaintiff to prove that a seizure ("a governmental

---

[7] Defendants cite *D.C. v. Wesby,* 583 U.S. 48, 64 (2018) for a number of propositions, including that whether Plaintiff as a matter of fact touched Officer Blommel is irrelevant, and whether Plaintiff touching either officer is a material dispute of fact viewed in the totality of the circumstances. Doc. 20 at 17–18. However, as mentioned elsewhere, Defendants base their arguments almost entirely on the facts as recalled by Officers Blommel and Landry and fail to grapple with the reality that the Court must "view the facts and draw reasonable inferences" in favor of Plaintiff. *Wesby,* 583 U.S. at 53 n.1 (citation omitted); *See Priester*, 208 F.3d at 925 n.3 (explaining that the Court must view the facts and *all* reasonable inferences in the light most favorable to the Plaintiff and consider the legal issue of whether "Plaintiff's facts" if proven, show that Defendant(s) violated clearly established law).

termination of freedom of movement through means intentionally applied") occurred—and that the force used to effect the seizure was unreasonable. *Id.* at 19 (citing *Brower v. Cty. of Inyo*, 489 U.S. 593, 596 (1989)).

They argue that in the case of a dog bite, Plaintiff must show evidence that the officer commanded or willfully allowed the dog to bite her. Doc. 20 at 19 (citing *Montanez v. City of Orlando,* 678 F. App'x 905, 912 (11th Cir. 2017)). Finally, they argue that because the evidence here does not show that Officer Landry deployed his canine or commanded it to bite Plaintiff, there was no intentional seizure and therefore no excessive force violation. Doc. 20 at 20.

As to Officer Blommel, Defendants emphasize that he was not handling the dog and therefore cannot be held liable for any excessive force. *Id.* at 20. Even if Plaintiff had properly brought a claim for failure to intervene under § 1983 against Blommel, they argue her claim could not go forward because he was undisputedly in no position to observe or intervene to stop Plaintiff from being bitten.

As to the threshold issue of seizure, Plaintiff responds that Landry's own testimony reflects that the dog was intentionally employed as a use of force to apprehend her. Doc. 27 at 20–21. She cites an Eleventh Circuit decision wherein a police dog's bite was found to be a Fourth Amendment seizure even though the dog bit a bystander, and the Court also denied summary judgment to a second officer who merely watched in silence as the dog targeted and bit an individual. *Id.* at 21–22. Plaintiff also cites several decisions in which officers were denied qualified immunity for allowing canines to bite non-resisting apprehended individuals for minutes without

pulling off the dog. *Id.* at 22–23. Thus, Plaintiff argues that based on the facts here, the dog bite she suffered was clearly an intentional use of force and therefore a seizure under the Fourth Amendment. *Id.* at 23. Moreover, Plaintiff argues that clearly established law reflects that such force was unreasonable because Landry allowed the dog to bite her and inexplicably refused to command it to cease its bite, leading to severe injuries. *Id.* at 23–24.

Upon review of this Motion and the response, the Court entered an order directing supplemental briefing as to the proper framework for analyzing the excessive force claim. *See* Doc. 44. Specifically, the Court noted that the Parties had briefed: (1) whether the bite constituted a seizure under the Fourth Amendment; (2) whether the officers' actions were reasonable or excessive under *Graham v. Connor,* 490 U.S. 386 (1989), and related caselaw; and (3) whether, as relevant to the issue of qualified immunity, Plaintiff satisfies her burden of showing that Defendants violated her clearly established rights based on her version of the facts. Doc. 44 at 1–2.

However, the Court noted that the Parties' initial briefing considered Plaintiff's dog bite as a single incident for each step of the analysis. Therefore, supplemental briefing was needed on whether the initial bite and Defendants' alleged failure to pull the dog off sooner should be considered as separate incidents—and whether treating these as separate incidents of force affected the analysis. *Id.* at 2.

Defendants submitted their supplemental brief (Doc. 45), in which they argued that a seizure could only have happened if a command was issued to apprehend, which was not the case here. *Id.* at 2. Further, they argued that under *Graham v. Connor*,

neither the initial bite nor the allegedly prolonged bite would constitute a constitutional violation. *Id.* at 3. Defendants (without citation to caselaw) also argued that prolonged bite violations arise only when the dog is used on a fully compliant or secured suspect, and that because Plaintiff and her son were never handcuffed, instead "resist[ing]" the dog for the entire time of the bite, this is not the case here. *Id.* at 3.

Moreover, Defendants argue that "a minute" is not enough to constitute excessive force because "Plaintiff and her son resisted the dog's bite the entire time." *Id.* at 4. Thereafter, they separated the body of caselaw on police K-9 excessive force cases into three categories, depending on whether an order to apprehend was ever made by the handler, and whether the victim was the suspect or an innocent bystander. *Id.* at 5–12. Notably, these three categories appear to be created by Defendants and were not set forth in an Eleventh Circuit (or any other) decision.

The first category Defendants describe are those cases in which the handler issued an order to bite and apprehend a fleeing suspect. *Id.* at 5–6. Defendants argue that in such cases an initial seizure indisputably occurs, and "[c]onsequently, there is no issue as to whether an arrest or seizure might have emerged through a prolonged bite when one was not present at the start."[8] *Id.* at 6.

The second category Defendants outline are those cases in which a handler ordered his canine to apprehend an individual, and the canine bit an innocent

---

[8] Effectively, Defendants argue that no matter the length, severity, or circumstances surrounding a prolonged dog bite in the presence of officers, it would not constitute excessive force where there was no order to apprehend. Notably, no binding authority is cited to support this position, nor did the Court find support for this position.

bystander. *Id.* at 7–8. They first cite cases in which courts have found that a seizure occurred where a dog was ordered to apprehend a suspect, let off the leash, and then bit an innocent bystander. However, they concede that this law is not well-settled, as other trial courts within the Eleventh Circuit have found that a seizure requires specific intent to apprehend the innocent bystander. *Id.* at 7–8. On the issue of a prolonged bite, Defendants argue that even if there was a seizure, a "less-than-1-minute bite on a threatening person running right toward Officer Landry, crashing over a table in the process, with several men battering a fellow officer right behind her" is not comparable to the relevant cases. *Id.* at 8.

Finally, Defendants present what is in their view a third category of cases, those in which a handler did not issue an order to apprehend. *Id.* at 8–10. They assert that an officer cannot be held liable in those instances where his dog remains on a lead but bites an innocent bystander because there was no "intentional acquisition of physical control." *Id.* Defendants address a core issue the Court identified in its request for additional briefing—"whether a constitutional violation may emerge through an unnecessarily elongated bite in the absence of an initial seizure." *Id.* at 9. Defendants argue that there are no such cases because there is never a "point where an intent to seize or arrest an innocent bystander would develop."[9] *Id.*

---

[9] Defendants' emphasis on this category of cases is not persuasive, because there is support in the record (from the Officers' Depositions and affidavits) that they did consider Plaintiff to be a suspect. Moreover, as Officer Landry repeatedly stated in his sworn report and deposition, he "[g]uided [the dog] into the apartment to utilize him to assist and protect Officer Blommel by biting one of the subjects striking him." Doc. 20-17 at 3. And he described the bite as a use

Plaintiff responded to Defendants' supplemental briefing. *See* Doc. 47. She outlines her own three categories of dog bite cases. Plaintiff separates the relevant cases into those where officers had probable cause to arrest, innocent bystanders, and cases where the officers had no probable cause to arrest. *Id.* at 3. She argues that for cases in this third category, such as hers, a dog bite must be evaluated as a single incident of excessive force.[10] *Id.*

*The Law of Excessive Force*

The use of excessive force in making an arrest violates the Fourth Amendment. *See Davis v. Williams*, 451 F.3d 759, 767 (11th Cir. 2006). Whether the amount of force used was reasonable or excessive is determined objectively "from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight" and requires "careful attention to the facts and circumstances of each particular case." *Priester,* 208 F.3d at 924 (quoting *Graham v. Connor,* 490 U.S. 386 (1989)).

Factors to be analyzed include: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight. *Priester,* 208 F.3d at 924; *Mercado v. City of Orlando,* 407 F.3d 1152, 1157 (11th Cir. 2005). The totality of the circumstances are considered "to determine whether the manner of

---

of force, noting that although the dog was not commanded to bite, it was there to apprehend the suspects and could have apprehended "[e]very one of them." Doc. 27-1 at 10.

[10] Like Defendants, Plaintiff does not support its description of the "categories" of dog bite cases by citation to authority from within or outside the Eleventh Circuit. Doc. 47 at 9–13.

arrest was reasonable." *Draper v. Reynolds,* 369 F.3d 1270, 1277 (11th Cir. 2004). "[I]n determining if force was reasonable, courts must examine (1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted." *Id.* at 1277–78 (quoting *Lee,* 284 F.3d at 1198). The force exerted by the officer must be "reasonably proportionate to the need for that force" which is measured by the three factors set forth in *Priester*. *Lee*, 284 F.3d at 1198.

All claims of excessive force "should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham,* 490 U.S. at 395. Accordingly, to satisfy the first prong of the test, Plaintiff must demonstrate that: (1) a seizure occurred and (2) the force used to effect the seizure was objectively unreasonable. *Troupe v. Sarasota County*, 419 F.3d 1160 (11th Cir. 2005).

Defendants argue that there was no intentional seizure because Officer Landry had the dog restrained and never unleashed it or commanded it to bite anyone. Citing Officer Landry's affidavit, they argue that the bite was instinctual and occurred despite Officer Landry holding the dog's collar. Doc. 20 at 20. Due to his lack of intent, they argue that there was no seizure and that summary judgment is due in favor of the officers. *Id.*

Crucially, Defendants commit the error of relying upon their own facts at this juncture, rather than Plaintiff's version. This is a mistake that the Eleventh Circuit has explicitly instructed courts *not* to make in similar cases. For example, in *Priester,* 208

F.3d at 925, the Eleventh Circuit reversed the trial court's grant of qualified immunity

to an officer on a motion for judgment as a matter of law.[11]

> Reversing the trial court, the Eleventh Circuit noted that:
>
> In reaching the conclusion that [Defendant Officer] Cushing was entitled
> to judgment as a matter of law, it appears that the district court
> mistakenly relied upon Defendants' version of the facts, rather than
> Plaintiff's version of the facts, as it was required to do. The district court
> said "[the dog] bit Priester once or twice" and "both Cushing and
> Wheeler immediately commanded Priester to put his hands up and stop
> resisting the police dog so that the dog could release his hold." But, it was
> Defendants' testimony—not Plaintiff's—that the dog only bit Plaintiff
> once or twice. And, it was Defendants' testimony—not Plaintiff's—that,
> when the dog bit Plaintiff, they immediately commanded Plaintiff to put
> his hands up and stop resisting.

*Id.*

As described below, having made all reasonable inferences in favor of *Plaintiff*,

the Court finds that she was seized within the meaning of the Fourth Amendment.

Although "[i]n general, no seizure occurs when innocent bystanders are harmed by

police actions," "[c]ourts take a different tack in cases involving police dogs." *Hope v.*

*Taylor,* No. 8:20-cv-196-VMC-AAS, 2020 WL 1677315, at *3 (M.D. Fla. Apr. 6,

2020). This is because "[o]nce deployed, a police-dog is generally unable to

discriminate between suspects and innocent parties and is generally trained to bite

---

[11] This decision is supportive here because "the standard for granting summary judgment
mirrors the standard for judgment as a matter of law, such that the inquiry under each is the
same." *Chapman v. AI Transport,* 229 F.3d 1012, n.11 (11th Cir. 2000) (en banc) (quoting *Reeves
v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 2110, 147 L.Ed.2d 105 (2000)).

whomever it encounters, facts suggesting the officer's intention to seize whomever the dog ultimately does encounter." *Id.*

On "Plaintiff's version" of the facts, there is evidence in the record that Officer Landry approached the doorway (and possibly entered the room) with the intention of having his dog apprehend one or more of the suspects in the apartment by biting them.[12] Although Plaintiff admittedly tripped and fell in front of the dog, and there is no evidence in the record that Officer Landry commanded it to bite her, her freedom to leave was terminated by the dog, which bit her near the exit to her apartment as the dog was being intentionally deployed. *See Hope*, 2020 WL 1677315, at *4. Plaintiff has thus established a seizure for purposes of the Fourth Amendment with regard to the initial bite.

Moreover, even if the Court found that the *initial* bite did not constitute a seizure, Plaintiff (and other eyewitnesses) allege that Officer Landry stood by, saying nothing, "in a daze" with his hands on his knees, as the dog continued to bite her and Plaintiff yelled in pain. By Defendants' own definition of an intentional seizure (Doc. 20 at 19), this too would constitute evidence that Officer Landry "willfully allowed [the dog] to bite" Plaintiff, which would separately constitute an intentional seizure for purposes of the excessive force analysis. *See Montanez,* 678 F. App'x at 912.

---

[12] For example, Landry's testimony and report reflect that the dog was guided into the apartment to "assist and protect Officer Blommel by biting one of the subjects striking him." Doc. 20-17 at 3. He also describes the dog's bite as a "use of force" on Saddlers and states in his deposition (Doc. 27-1 at 10) that the dog had full authority to apprehend her with a bite.

The next issue is whether the force was unreasonable and excessive. Defendants make little to no argument that the force was *reasonable* under the standard set out in *Graham v. Connor,* as they instead focus on the issue of whether there was a seizure at all. Under *Graham*, courts determine the "objective reasonableness" of a seizure by balancing the "nature and quality of the intrusion" against the "countervailing governmental interest at stake." 490 U.S. at 396. Such a test does not look to an officer's motivation or intent, but rather asks if a reasonable officer would have taken the same action under the same circumstances. *Trammell v. Thomason,* 559 F. Supp. 2d 1281, 1290 (M.D. Fla. 2008), *aff'd in part, rev'd in part and remanded,* 335 F. App'x 835 (11th Cir. 2009).

The Supreme Court has recognized that the "right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham,* 490 U.S. at 396. Thus, in determining whether an officer's use of force was objectively reasonable, a court must consider the *Graham* factors: (1) the underlying crime's severity, (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect actively resists arrest or attempts to flee.[13] 490 U.S. at 396.

---

[13] Other relevant factors noted by the Eleventh Circuit include: "(1) the need for the application of force, (2) the relationship between the need and the amount of force used, (3) the extent of the injury inflicted and (4) whether the force was applied in good faith or maliciously or sadistically." *Slicker v. Jackson,* 215 F.3d 1225, 1232–33 (11th Cir. 2000).

Here and below, the Court will consider this incident as two uses of force, borrowing the analytical framework used by another court in this district in *Diane Hope v. Taylor,* No. 8:20-CV-196-VMC-AAS, 2021 WL 694177, at *6 (M.D. Fla. Feb. 23, 2021).[14] Also a police dog bite case, the court there considered the incidents of force separately based on the police dog's initial deployment and its "continued use" during the time that the plaintiff was being bitten.[15] *Id.* at 6–8. It evaluated the reasonableness of these two incidents, finding that the initial decision to release the police dog to pursue three suspects did not constitute an excessive use of force under the circumstances. *Id.* at 6. The *Hope* court noted that the situation (in which three suspects who had not been searched for weapons fled a scene) was precisely the sort of tense, uncertain, and rapidly evolving situation contemplated in *Graham. Id.* Thus, it granted qualified immunity to the officer handling the dog to the extent of his initial decision to let it off his lead and utilize it. *Id.* at 7.

As for continued use of the dog, however, the *Hope* court gave separate consideration to the plaintiff's claim that the officer refrained from recalling the dog

---

[14] The Court notes that, by way of an Order directing supplemental briefing, the Parties were given an opportunity to discuss similar cases where courts considered excessive force dog bite claims in this manner. *See* Doc. 44; *see, e.g., Chatman v. Navarro,* No. 14-CV-62793, 2016 WL 9444164, at *6 (finding an officer's initial employment of a police dog to be reasonable, but denying summary judgment because there was a genuine dispute over how long the officer allowed the dog to bite the plaintiff).

[15] Many other trial courts in the Eleventh Circuit and outside it have considered dog bite excessive force cases in this manner. *See e.g., Carter v. Marion,* No. 7:12-CV-76 HL, 2013 WL 5220180, at *11 (M.D. Ga. Sept. 16, 2013).

until after it injured her and unreasonably allowed it to bite her for a gratuitous length of time. *Id.* at 7–8. Ultimately, summary judgment was denied to the officer, as the court found that "[w]ere a jury to credit Ms. Hope's testimony that Deputy Taylor remained silent until after Niko engaged, indeed until after he grabbed Niko minutes later, it could conclude that Deputy Taylor acted unreasonably by failing to call off Niko sooner." *Id.* (citing *Priester,* 208 F.3d at 927; *Trammell,* 559 F. Supp. 2d at 1295).

This Court will rule similarly as to reasonableness of the force Officer Landry used. As to the initial utilization of the dog in the apartment, the Court will grant summary judgment to Officer Landry. Based on *Graham, Hope*, and other relevant authority, Landry did not commit an excessive use of force by bringing the police dog up to the doorstep of the apartment, at which point Plaintiff fell and was bitten instantly. It is undisputed that his partner, Officer Blommel, was in a dangerous and potentially volatile situation as he had been dragged into the apartment in the course of arresting Lorenzo, was actively fighting him, and had attempted to tase him.

Additionally, the Court has considered the relevant *Graham* factors: (1) the underlying crime's severity, (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect actively resists arrest or attempts to flee. 490 U.S. at 396.  Each of the *Graham* factors supports summary judgment in favor of Officer Landry as to the initial bite.

The underlying crime that brought Officer Landry and the dog to the doorstep (and possibly into the apartment) was Lorenzo's ongoing fight with Officer Blommel. A reasonable officer on the scene would observe the fight between his partner and a

suspect in a cramped and crowded apartment as posing an immediate threat to the safety of the officers. Finally, it is undisputed that Lorenzo was actively resisting arrest. Thus, because *Graham* holds that the Court must make allowances for the fact that Officer Landry was forced to make a split-second judgment while observing Officer Blommel and Lorenzo fighting inside the apartment, the Court finds that this is the sort of "tense, uncertain, and rapidly evolving situation" contemplated in *Graham*. *Id.* at 396–97. Consequently, summary judgment will be granted to Officer Landry as to the initial use of force on Plaintiff when she tripped and fell near the doorway (assuming it does constitute an intentional seizure).

Next, the Court considers whether what Plaintiff's son characterized as "a good minute" of aggressive biting Plaintiff suffered while Officer Landry stood by silently and made no effort to release the dog constitutes excessive force.

Based on the relevant authority and evidence in the record, the Court concludes such a use of force would be excessive. If a jury credited the testimony of Plaintiff (and/or her family) regarding the length of the bite, Officer Landry's actions and lack of action, and his statements subsequent to the incident, it could conclude that he acted unreasonably by failing to call off the dog sooner. *See Priester,* 208 F.3d at 927; *Trammell,* 559 F. Supp. 2d at 1295.

Considering the *Graham* factors in light of the prolonged bite of Plaintiff similarly supports denying qualified immunity to Officer Landry on this second part of the incident, the prolonged bite. In terms of the severity of the underlying crime, Plaintiff (and others) testified that she had not touched any of the officers and simply

tripped near the door while carrying her granddaughter. Consequently, her actions would have posed no danger to the officers (and all the more clearly, no danger that would call for a prolonged period of biting by a police dog). Finally, Plaintiff's version of the sequence of events is that she did not resist arrest or flee the scene, but merely moved to protect her granddaughter and let the officers by.[16]

Based on the *Graham* factors, the record, and considering Plaintiff's version of events, the Court finds that the prolonged duration of the dog bite on Plaintiff was excessive force. *See Hadley,* 526 F.3d at 1330 ("Our cases hold that gratuitous use of force when a criminal suspect is not resisting arrest constitutes excessive force."). This is because it was not "reasonably proportionate to the need for that force." *Ingram v. Kubik,* 30 F.4th 1241, 1252 (11th Cir. 2022) (citations and quotations omitted). Moreover, because Plaintiff (on her version of events) "was not committing a crime, resisting arrest, or posing an immediate threat to the officers at the time [s]he was [bitten]," Officer Landry "used excessive force when apprehending." her. *Id.*

---

[16] The analysis in *Fils v. City of Aventura*, 647 F.3d 1272, 1289 (11th Cir. 2011), excerpted here, illustrates other similar situations (not involving police dogs) in which the Eleventh Circuit found that a defendant officer's conduct may have been excessive force.

> Other cases confirm that non-violent suspects, accused of minor crimes, who have not resisted arrest—just like [Plaintiff]—are victims of constitutional abuse when police used extreme force to subdue them. In *Hadley v. Gutierrez,* 526 F.3d 1324 (11th Cir. 2008), the defendant-officer used excessive force when he punched the plaintiff in the stomach while the plaintiff was handcuffed and not resisting arrest. *Id.* at 1330. And, in *Priester v. City of Riviera Beach, Florida,* 208 F.3d 919 (11th Cir. 2000), the court held that the defendant-officer used excessive force when he released his police dog to attack the plaintiff, who was accused of a minor, non-violent offense, who had obeyed every police command, and who was lying still on the ground when the defendant-officer released his dog. *Id.* at 923–24.

Thus, Plaintiff has satisfied her burden to show that "the officer violated a constitutional right." *Id.; see Hope*, 2021 WL 694177 at *8; *see also Baker v. Cohen,* No. 09-60103-CIV, 2010 WL 3385266, at *14 (S.D. Fla. Aug. 5, 2010*), report and recommendation adopted in part,* No. 09-60103-CIV, 2010 WL 3385264 (S.D. Fla. Aug. 26, 2010).

*Clearly Established Right*

The relevant question to determine whether a right is clearly established is whether it would be "sufficiently clear that a reasonable officer would understand that what he is doing violates that right." *Oliver v. Fiorino,* 586 F.3d 898, 907 (11th Cir.2009) (quoting *Wilson v. Layne,* 526 U.S. 603, 615 (1999)). In making this inquiry, the precedent of the Supreme Court of the United States, the Eleventh Circuit, and the Florida Supreme Court is considered. *See McClish v. Nugent,* 483 F.3d 1231, 1237 (11th Cir. 2007). "[I]f case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." *Priester,* 208 F.3d at 926 (quoting *Smith v. Mattox,* 127 F.3d 1416, 1419 (11th Cir. 1997)). However, if a plaintiff establishes "that the official's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of caselaw," then the official will not be entitled to qualified immunity. *Id.* Alternatively, a plaintiff can point to a "broader, clearly established principle" in binding caselaw such that the officer had fair warning. *See Haberski v. Bufano,* 728 F. App'x 903, 908–09 (11th Cir. 2018).

As to a clearly established right, it is Plaintiff's burden to establish once it has been shown that the Officers acted in their discretionary authority. Plaintiff highlights two dog bite cases, *Priester v. City of Riviera*, 208 F.3d 919 (11th Cir. 2000), and *Edwards v. Shanley*, 666 F.3d 1289 (11th Cir. 2012) as the most factually similar cases to hers. Doc. 27 at 20–23. She argues that they clearly establish that the dog bite violated her rights. As described below, the Court agrees.

The Eleventh Circuit has (since the year 2000) "repeatedly ruled that a police officer violates the Fourth Amendment, and is denied qualified immunity, if he or she uses gratuitous and excessive force against a suspect who is under control, not resisting, and obeying commands." *Saunders v. Duke*, 766 F.3d 1262, 1265 (11th Cir. 2014) (collecting cases and denying qualified immunity to officer who slammed the suspect's head on the ground when suspect was not dangerous or attempting to flee); *see also Fils*, 647 F.3d at 1288–89 (tasing an unrestrained arrestee who had committed a non-serious offense, who posed no threat to the safety of the officer or to others, who had disobeyed no orders, and who was not resisting arrest or attempting to flee constituted excessive force); *Hadley v. Gutierrez,* 526 F.3d 1324, 1330 (11th Cir. 2008) ("Our cases hold that gratuitous use of force when a criminal suspect is not resisting arrest constitutes excessive force."); *Smith v. Mattox,* 127 F.3d 1416, 1419 (11th Cir. 1997) (force sufficient to break the arm of arrestee who had "docilely submitted" to law enforcement is excessive, and officer not entitled to qualified immunity); *Thompson v. Mostert,* 489 F. App'x 396, 397–98 (11th Cir. 2012) (officers used excessive force

when deploying Taser to arrest individual who was charged with obstructing justice without violence).[17]

Next, as Plaintiff emphasizes, two cases more factually alike are *Priester* and *Edwards*. In *Priester,* the Eleventh Circuit denied qualified immunity to an officer who let a dog bite a suspect for a period of approximately two minutes, during which it was clear that the suspect did not pose a threat of bodily injury to the officer and the suspect was not attempting to flee or resist arrest. 208 F.3d at 927. In *Edwards v. Shanley*, the Eleventh Circuit summarized *Priester* in the following way: "Quite simply, [] we held in *Priester* that it was unconstitutional to subject a compliant suspect to the 'eternity' of two minutes of dog attack." 666 F.3d 1289, 1298 (11th Cir. 2012). The court continued that it was similarly unconstitutional to subject a compliant suspect to a longer attack of five to seven minutes, "especially where that suspect is pleading for surrender." *Id.*

Considering this authority and the factual record in the light most favorable to Plaintiff, the Court finds that at the time of this incident, "clearly established federal law prohibit[ed] the police from subjecting a compliant subject who is attempting to surrender to a lengthy dog attack." *Id.* Alternatively, as mentioned above, a number of other Eleventh Circuit cases readily serve as the clearly established right of Plaintiff's

---

[17] And even though Plaintiff was not handcuffed when bitten, this is not dispositive. Instead, the Eleventh Circuit has held that the rationales from decisions "concerned with gratuitous use of force on handcuffed suspects" can also apply to "the use of gratuitous force when the excessive force is applied prior to the handcuffing." *Badia*, 47 F.4th at 1184–85; *Shaffer v. Scarborough,* No. 8:23-CV-00680-WFJ-NHA, 2025 WL 278380, at *11 (M.D. Fla. Jan. 23, 2025) (collecting cases).

that was violated, such as *Hadley,* 526 F.3d at 1330, which held that gratuitous use of force when a criminal suspect is not resisting arrest constitutes excessive force. A jury could credibly believe that the Plaintiff was bitten by the police dog for a gratuitous duration of time that night, during which time the officer handling the dog failed to release the dog's bite causing severe injuries. Therefore, the Court finds that clearly established federal law prohibited subjecting Plaintiff to the prolonged dog bite.[18] *See Hope*, 2021 WL 694177 at *9.

**Officer Blommel**

The Court will grant Officer Blommel summary judgment on Plaintiff's claim for excessive force under 42 U.S.C. § 1983. Defendants argue that the record is clear that he was not handling the police dog. Doc. 20 at 20. Moreover, even if Plaintiff had

---

[18] Again, the Eleventh Circuit's decision in *Fils*, 647 F.3d at 292, is instructive. That case involved an excessive force claim based on the use of a stun gun and tackling a suspect, finding that:

> Under either method, Bergert and Williams should have known that their conduct violated Maurice's Fourth Amendment rights. Maurice was tased even though he committed at most a minor offense; he did not resist arrest; he did not threaten anyone; and he did not disobey any instructions (for none were given). These facts are sufficiently similar to the facts of *Priester* and *Vinyard* that these Defendants were on notice that their conduct violated [the plaintiff] Maurice's rights. In *Priester,* the defendant-officer set his attack dog on the plaintiff even though the plaintiff had submitted to the defendant-officer's every command and was laying flat on the ground. 208 F.3d at 927. And, in *Vinyard,* the defendant-officer sprayed pepper spray into the eyes of a non-violent plaintiff, who was handcuffed safely in the back seat of the defendant-officer's police car, and had threatened no one. 311 F.3d at 1347–48. These two cases clearly establish that such force is excessive where the suspect is non-violent and has not resisted arrest. While these cases are not identical to Maurice's case, they need not be "materially similar"; the precedent need only provide the Defendants with "fair warning." *Hope,* 536 U.S. at 741, 122 S.Ct. at 2516. These cases do just that.

clearly brought a § 1983 claim for failure to intervene, they argue that he was in no position to observe and intervene in Officer Landry's use of force. *Id.* (citing *Priester*, 208 F.3d at 929; *Militello v. Sheriff of the Broward Sheriff's Off.,* 684 F. App'x 809, 813 (11th Cir. 2017) (citations omitted)).

Plaintiff responds, citing to authority and arguing that a seizure occurred once the dog was deployed by Officer Landry and bit Plaintiff. Doc. 27 at 21. Plaintiff argues that this deployment, as admitted by Officer Landry, was intentional and meant to apprehend her by way of a dog bite. Plaintiff goes on to argue that clearly established law reflects that the force was unreasonable, namely in that Officer Landry allowed the dog to bite her and refused to command it to cease its bite. *Id.* at 22–24.

Plaintiff makes very little argument, however, regarding the claim as against Officer Blommel. She does note that in *Priester* and *Edwards*, a second officer who was present but failed to intervene was likewise denied qualified immunity. *Id.*

However, those cases are clearly distinguishable as to the role of the bystander officer. First, in *Edwards*, the officer handling the dog inflicted "gratuitous and sadistic" pain on the compliant suspect by ordering a five to seven minute dog attack. 666 F.3d at 1296. Moreover, the officer Edwards sued for failure to intervene merely "stood over" him during the course of this dog bite. Here, it is undisputed that Officer Blommel was actively wrestling, attempting to arrest, and using a taser on Plaintiff's significant other while Plaintiff was being bit.

*Priester* is similarly distinguishable. There, the bystander officer (not handling the canine) stood on top of a canal with a flashlight on the scene and watched his

partner's dog attack a suspect for as long as two minutes. *Priester,* 208 F.3d at 925. The Court thus found that both observed the excessive force and had the opportunity to intervene.

Here, however, no reasonable jury could find Officer Blommel liable for failing to intervene in the use of excessive force by Officer Landry, as the undisputed facts show that he did not: (1) have a sufficient opportunity to observe the violation or (2) have the opportunity to intervene and fail to do so. *Id.*; *see also Helm v. Rainbow City, Alabama,* 989 F.3d 1265, 1278 (11th Cir. 2021). Therefore, the Court will grant summary judgment for Officer Blommel.

### 2. State-Law Battery, Negligence, and False Arrest Claims (Counts I, II, and III)

Finally, Defendants argues that the City of Lakeland cannot be held liable for Plaintiff's claims against it for battery, negligence, and false arrest. Doc. 20 at 27–31.

*Battery (Count I)*

In her battery claim (Count I), Plaintiff alleges that Officers Blommel and Landry committed the state law tort of battery against her, which is actionable against the City of Lakeland pursuant to § 768.28(9)(a), Fla. Stat. (2021). Doc. 2 at 9–10. Specifically, she asserts that they intentionally and harmfully touched her without her consent and with no legal or justifiable reason by "using a dog's bite" to effect her arrest, and thus "harmfully applying an amount of force that was unreasonable and excessive under the circumstances." *Id.* at 10.

51

Defendants argue that summary judgment is warranted because there is no record evidence from which a jury could reasonably find that the dog bite was in any way intentional, and that because Plaintiff cannot prove that either officer intended to cause contact or apprehension of imminent contact, she cannot maintain her common law battery claim against the City. *Id.* at 27–29. Additionally, Defendants cite *Clayton v. City of Boynton Beach,* No. 06-80069-CIV, 2007 U.S. Dist. LEXIS 115994 at *5 (S.D. Fla. Mar. 30, 2007) for the proposition that where the tort of false arrest is alleged (as it is here), claims for battery based on acts that are part of the arrest process do not give rise to an independent tort. Doc. 20 at 28.

Plaintiff responds by citing caselaw in which Florida state-law battery claims have been defined as merely the "intentional infliction of a harmful or offensive contact upon the person of another," and argues that a reasonable jury could readily find that the force used to arrest Plaintiff was intentional and unreasonable. Doc. 27 at 26. Moreover, considering the alleged lack of probable cause for her arrest, she argues that the unreasonableness of the force used to apprehend her is further amplified. *Id.*

In Florida, battery has two elements: (1) "inten[t] to cause a harmful or offensive contact," and (2) a resulting "offensive contact with the person of the other." *City of Miami v. Sanders*, 672 So. 2d 46, 47 (Fla. 3d DCA 1996). In the arrest context, "[a] battery claim for excessive force is analyzed by focusing upon whether the amount of force used was reasonable under the circumstances." *Id.* "If excessive force is used in an arrest, the ordinarily protected use of force by a police officer is transformed into a

battery." *Id.*  However, "ordinary incidents of [an] arrest ... do not give rise to an independent tort." *Lester v. City of Tavares,* 603 So. 2d 18, 19–20 (Fla. 5th DCA 1992); *see also Baxter v. Roberts,* 54 F.4th 1241, 1273 (11th Cir. 2022)

Under Florida law, "[a] police officer may be liable for the use of excessive force (i.e., battery) while effectuating a lawful arrest . . . If an officer uses excessive force, the 'ordinarily protected use of force . . . is transformed into a battery.'" *Kimbrel v. Clark,* 385 So. 3d 1124, 1128 (Fla. 1st DCA 2024) (quoting *City of Miami v. Sanders,* 672 So. 2d 46, 47 (Fla. 3d DCA 1996)). "Police officers receive a presumption of good faith, however, as to the use of force applied during a lawful arrest." *Id.* And "[o]fficers are only liable for damage where the force used is 'clearly excessive.'" *Id.* (quoting *City of Miami,* 672 So. 2d at 47); *see also Lester v. City of Tavares,* 603 So. 2d 18, 19–20 (Fla. 5th DCA 1992) ("[O]rdinary incidents of [an] arrest ... do not give rise to an independent tort."). Indeed, "[l]aw enforcement officers are provided a complete defense to an excessive use of force claim where an officer 'reasonably believes [the force] to be necessary to defend himself or another from bodily harm while making the arrest.'" *City of Miami,* 672 So. 2d at 47 (quoting Fla. Stat. § 776.05(1) (1995)). "A battery claim for excessive force," therefore, "is analyzed by focusing upon whether the amount of force used was reasonable under the circumstances." *Id.*

As to Count I (Battery), Defendants' motion for summary judgment is due to be denied. Above, the Court concluded that a reasonable jury could find in favor of Plaintiff on her excessive force claim under 42 U.S.C. § 1983 based on Officer Landry's failure to release the dog's bite of her. Similarly, a reasonable jury could find that

Officer Landry used excessive force in failing to call the canine off Plaintiff, thus transforming her arrest into a battery that the City of Lakeland can be held liable for. *Kimbrel,* 385 So. 3d at 1128.   As discussed above, the Court will grant summary judgment in favor of Officer Blommel on Plaintiff's claim for excessive force under 42 U.S.C. § 1983.

*Negligence (Count II)*

In Count II, Plaintiff brings a negligence claim against the City based on Officers Blommel and Landry violating their "duty of reasonable care to Plaintiff," *i.e.,* the "assurance that she would not be unjustifiably harmed by the police dog under their supervision and control." Doc. 2 ¶¶ 40–41. She claims that they violated that duty by permitting the police dog to attack her.

The City concedes that it owed Plaintiff a duty through the Officers, vicariously, to exercise reasonable care, but contends that the evidence shows that Plaintiff cannot prove a breach of that duty. Doc. 20 at 29–30. It argues that no reasonable jury could find that the Officers breached their duty of reasonable care in handling the canine. *Id.* at 30. Specifically, the City argues that it is undisputed Plaintiff tripped over a table and fell into the doorway in front of the canine, and that her son was kicking the canine, which bit instinctively despite Officer Landry holding it back by his collar. *Id.* at 30. It thus contends that there is "not so much a suggestion in the record evidence" that the canine was acting unjustifiably aggressively or that Officer Landry mishandled it. *Id.* Nor, argues the City, can Plaintiff argue that the canine's presence was unwarranted, given the altercation between Lorenzo Isaac and Officer Blommel taking

place in the apartment. In conclusion, the City argues that Plaintiff cannot prove that the Officers breached their duty of reasonable care in handling the canine, meaning summary judgment should be granted in the City's favor.

Plaintiff disagrees, arguing in a single sentence that "a reasonable jury can determine alternatively that Landry breached his duty of reasonable care in handling his dog to ensure Ms. Saddler's safety, and thus find negligence as to Count II." Doc. 27 at p. 27. The Court agrees with Plaintiff.

"To state a claim for negligence under Florida law, a plaintiff must allege that the defendant owed the plaintiff a duty of care, that the defendant breached that duty, and that the breach caused the plaintiff to suffer damages." *Lewis v. City of St. Petersburg*, 260 F.3d 1260, 1262 (11th Cir. 2001). The City does not contest that it owed Plaintiff a duty to exercise reasonable care. Plaintiff has alleged that the Officers (and she especially highlights the role of Officer Landry in her response) failed to exercise reasonable care and ensure that she would not be unjustifiably harmed by their police dog. Doc. 2 at 10–11. She argues that such reasonable care was not exercised, resulting in severe and potentially permanent injuries. Doc. 27-8. The Court agrees that a reasonable jury could find in favor of Plaintiff based on the record, and Defendants' Motion will thus be denied. Genuine issues of material fact exist as to whether the City was negligent.

*False Arrest (Count III)*

Plaintiff also brings a state-law false arrest claim against the City of Lakeland as (in her view) there was no probable cause to arrest her for a criminal offense, including battery on a police officer. *See* Doc. 2 at 11–12.

The City moves for summary judgment, arguing that probable cause completely bars an action for false arrest and—as they argued for the false arrest claim brought under § 1983, the record shows that Defendant Officers had probable cause to arrest Plaintiff.

Plaintiff responds, unsurprisingly, that "for the same reasons that neither officer had arguable probable cause to arrest Ms. Saddlers," they had no actual probable cause either. Doc. 27 at 27. Because Plaintiff never actually or intentionally touched either officer, she argues that no reasonable officer in those circumstances would have concluded that actual probable cause supported her arrest. *Id.*

A false arrest claim under Florida law is substantially the same as a claim for false arrest under § 1983. *Pollard v. City of Fort Myers Police Dep't,* No. 2:15-CV-79-JES-DNF, 2015 WL 859397, at *4 (M.D. Fla. Feb. 27, 2015). A plaintiff must prove three elements to sustain a claim for false arrest: (1) an unlawful detention and derivation of liberty against the plaintiff's will; (2) an unreasonable detention which is not warranted by the circumstances; and (3) an intentional detention. *Tracton v. City of Miami Beach,* 616 So. 2d 457 (Fla. 3d DCA 1992). Probable cause may be raised as an affirmative defense to a claim for false arrest; that is, an arrest of a criminal suspect by an officer acting with probable cause is a privileged detention. *Id.* (citing *Lee v. Geiger,* 419 So. 2d

717 (Fla. 1st DCA 1982)). Probable cause exists if, at the moment the arrest was made, the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense. *Holmes v. Kucynda,* 321 F.3d 1069, 1079 (11th Cir. 2003).

The evidence in the record and the Court's previous analysis provides a clear answer to the issue here—namely, that a reasonable jury could find that the Defendant Officers lacked actual probable cause to arrest Plaintiff. Genuine issues of material fact exist as to whether Plaintiff touched either of the Officers and many of the other circumstances of the incident. Therefore, the City of Lakeland's Motion as to this Count is denied.

Accordingly, it is hereby **ORDERED:**

1. Plaintiff's Motion to Exclude the Testimony of the Proffered Defense Expert Witness Under Fed. R. Evid. 702 and *Daubert* (Doc. 19) is **DENIED**.

2. Defendants' City of Lakeland, Florida, Benjamin Blommel, and Chad Landry's Motion for Summary Judgment (Doc. 20) is **GRANTED-IN-PART** as follows: Summary Judgment is granted in favor of Defendant Benjamin Blommel on Count V (Excessive Force Claim in Violation of the Fourth Amendment Against Benjamin Blommel in his Individual Capacity); Summary Judgment is **GRANTED-IN-PART in** favor of

Defendant Chad Landry on Count VII (42 U.S.C. § 1983 Excessive Force Claim in Violation of the Fourth Amendment Against Chad Landry in his Individual Capacity) as to the initial use of the dog and initial bite. All summary judgments will be entered at the conclusion of this litigation.

3. Defendants' Motion for Summary Judgment (Doc. 20) is otherwise **DENIED**.

4. Within **fourteen (14) days** of this Order, the Parties are directed to confer and file a notice indicating their availability for trial during the months of January through October, 2026. Upon receipt of the notice, the Court will reschedule this case for trial.

5. The Clerk is directed to administratively close this case. It will be reopened when it is scheduled for trial.

**DONE** and **ORDERED** in Tampa, Florida on September 29, 2025.

Charlene Edwards Honeywell
United States District Judge

Copies furnished to:
Counsel of Record
Unrepresented Parties